UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GORDON LAVALETTE,

Plaintiff,

-v.-

ION MEDIA NETWORKS, INC., and
R. BRANDON BURGESS,

Defendants.

16 Civ. 7286 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Gordon Lavalette contends that his former employer, ION Media

Networks, Inc. ("ION"), and ION's Chief Executive Officer, Defendant R.

Brandon Burgess ("Burgess") (collectively, "Defendants"), retaliated against

him after he brought to light Defendants' tax fraud and discriminatory

employment practices. In consequence, Plaintiff brings claims against both

Defendants for retaliation under the New York City Human Rights Law (the

"NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-131; against ION under the New

York False Claims Act (the "NYFCA"), N.Y. State Fin. Law § 191; and against

ION for breach of contract. Defendants now move for summary judgment;

move to strike certain portions of the record; and move to exclude testimony

and reports from Plaintiff's expert witness. The Court concludes that genuine

disputes of material fact remain as to each of Plaintiff's claims, thereby

foreclosing summary judgment. It reaches this conclusion without relying on

those portions of the record that Defendants move to strike, thereby mooting,

at least temporarily, that application.  Finally, the Court grants in part and denies in part Defendants' motion to exclude expert testimony.

## BACKGROUND[1]

### A.    Factual Background

### 1.    The Parties

The following facts are either undisputed or taken in the light most favorable to Plaintiff.  Defendant Burgess, in addition to being ION's Chief Executive Officer, also served as the Chair of ION's Board of Directors.  (Pl. Counter 56.1 ¶¶ 2-3).  During the period of Plaintiff's employment, Chris Parker was also a member of ION's Board of Directors.  (*Id.* at ¶ 3).  Terri Santisi was ION's Chief Administrative Officer.  (*Id.* at ¶ 21).

---

[1]    The facts herein are largely drawn from Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1" (Dkt. #101)), Plaintiff's Counter Statement of Undisputed Facts ("Pl. Counter 56.1" (Dkt. #125)), and Defendants' Reply Statement of Undisputed Facts ("Def. Reply 56.1" (Dkt. #129)).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in Defendants' Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by Plaintiff, the Court finds such fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  The Court relies in addition on declarations submitted by Plaintiff ("Lavalette Decl." (Dkt. #124)), Chris Parker ("Parker Decl." (Dkt. #103)), and Courtney S. Stieber ("Stieber Decl." (Dkt. #199)).

For convenience, the parties' briefs in connection with Defendants' motion for summary judgment are referred to as "Def. SJ Br." (Dkt. #100); "Pl. SJ Opp." (Dkt. #122); and "Def. SJ Reply" (Dkt. #128).  The parties' briefs in connection with Defendants' motion to exclude expert testimony are referred to as "Def. Expert Br." (Dkt. #105); "Pl. Expert Opp." (Dkt. #120); and "Def. Expert Reply (Dkt. #131).  The parties' briefs in connection with Defendants' motion to strike are referred to as "Def. Strike Br." (Dkt. #135); "Pl. Strike Opp." (Dkt. #138); and "Def. Strike Reply" (Dkt. #143).

Plaintiff began working as ION's Chief Financial Officer in April 2014. (Pl. Counter 56.1 ¶ 1). As CFO, Plaintiff's job duties included certain corporate tax matters. Significantly for purposes of the present motions, , Plaintiff maintains that other financial matters relevant to this litigation — including payroll taxes, the attribution of taxable income and withholdings for employees, and tax basis calculations — were not within his job responsibilities. (*Id.* at ¶ 7).

### 2. The Alleged Tax Fraud

Shortly after joining ION, Plaintiff came to believe that tax evasion was occurring at the company. (Pl. Counter 56.1 ¶ 35). In particular, Plaintiff uncovered three possible forms of tax fraud: improper tax withholdings; improper attribution of income-supplementing perks; and improper tax basis calculations.

### a. The Tax Withholdings

Plaintiff first investigated possible tax withholding violations concerning a number of ION employees. (Pl. Counter 56.1 ¶ 45). As but one example, Plaintiff came to believe that Defendant Burgess was not allocating the proper portion of his wages to New York State for purposes of his tax withholdings. (*Id.* at ¶ 35). Plaintiff raised a similar issue concerning Jeff Quinn, ION's Chief Commercial Officer. (*Id.* at ¶ 47). The parties dispute whether the relevant tax withholding procedures employed by ION did, in fact, violate the law. (*Id.* at ¶¶ 48-75).

### b.    The Perks

As early as May 2014, Plaintiff learned that ION had a practice of giving certain income-supplementing perks to executives (the "Perks"), such as permitting them extended stays in corporate apartments in New York City. (Pl. Counter 56.1 ¶ 18).  As soon as Plaintiff learned of this practice, he began raising an issue about proper withholding of taxes associated with these Perks.  (*Id*.).  According to Plaintiff, he was not alone in his concerns:  On June 13, 2014, ION Board member Parker sent an email to Plaintiff, Burgess, and others stating, in part, that "ION as a corporation needs to be highly confident that it is withholding properly for its employees given the real corporate liability that exists as an effective agent for state tax collection authorities."  (*Id.* at ¶ 17).  Plaintiff claims to have uncovered payroll tax evasion in the form of improper reporting of taxes related to ION employees' use of corporate apartments, New York residence status, and other benefits (Lavalette Decl. ¶ 103); he further maintains that oversight of payroll taxes was not within the scope of his CFO responsibilities (*id.* at ¶¶ 28-31).

### c.    The Tax Basis Calculations

As a third category of putative tax fraud, Plaintiff claims that, prior to his employment there, ION "exaggerate[ed] the value of its stations and licenses," and then used that exaggerated value to minimize its taxes due on the discharge of its debt in bankruptcy (the "Tax Basis Calculations"). (Lavalette Decl. ¶¶ 66-67).  As with the two prior categories, Plaintiff maintains that the Tax Basis Calculations were not part of his job responsibilities as the

CFO of ION, but were rather outsourced to a specialist tax consultant, Ernst & Young ("EY"); EY reported to Burgess, not to Plaintiff, and Plaintiff did not have access to the information that EY relied on for this work. (*Id.* at ¶ 68).

Plaintiff began investigating and raising concerns about the Tax Basis Calculations in the summer of 2015, including, for instance, by emailing questions about the calculations to EY. (Lavalette Decl. ¶ 71). On October 11, 2015, Plaintiff wrote to ION's former Head of Tax to advise that EY's then-present Tax Basis Calculations showed a "$150 Million lower basis" for deductions than had prior estimates, asking: "Does that make sense?" (*Id.* at ¶¶ 72-73). Subsequently, in late December 2015, Plaintiff met with Molly Ericson of EY to review materials for discussions between ION and a potential purchaser, the Sinclair Broadcasting Group ("Sinclair"). (*Id.* at ¶ 74). Plaintiff "pressed EY with questions about [the materials]." (*Id.*). Following internal discussions with EY, Ericson called Plaintiff and said, "We have a big problem," acknowledging approximately $30 million in tax liabilities stemming from misreporting. (*Id.*). Plaintiff also claims to have discovered certain abnormalities in the contract between ION and EY that enabled ION to instruct EY as to which financial figures to apply, without providing the supporting documents to EY for audit. (*Id.* at ¶ 76).

As Plaintiff recounts, when he "reported to Burgess the significant tax liability [he] had uncovered and what EY had said," he received a hostile response. (Lavalette Decl. ¶ 77). With that reporting avenue blocked, Plaintiff reported the errors in the Tax Basis Calculations to ION's General Counsel,

prompting the cancellation of a meeting regarding the proposed Sinclair transaction. (*Id.* at ¶ 81). Plaintiff and Burgess together then informed EY that the financial information that ION had provided to support the Tax Basis Calculations was unreliable, which information led to EY discontinuing its work on "the stock basis and the internal restructuring project[.]" (*Id.* at ¶ 82). Plaintiff also reported the tax basis liability to the Chief Operating Officer of another company, an individual who was neither an employee nor a Board member of ION. (*Id.* at ¶ 84).

### 3. The Audit Representation Letter

In February and March 2016, ION was working with an outside auditor, KPMG LLP, to prepare audited financial statements for lenders. (Pl. Counter 56.1 ¶ 156). ION was required to provide KPMG with an audit representation letter (the "Rep Letter") detailing certain information about its financials on or before March 30, 2016. (*Id.* at ¶¶ 157, 187).

Taken in the light most favorable to Plaintiff, the record shows that Plaintiff expressed concerns about the financial information contained in the Rep Letter. For example, on March 14, 2016, Plaintiff asked Santisi if there were "any open tax reporting items / exposures (apartments, NY withholding, etc.)." (Pl. Counter 56.1 ¶ 161). Burgess responded: "Less is more. Let's wrap it up," which Plaintiff understood as a command to stop raising questions about the tax issues and to sign the Rep Letter without resolving Plaintiff's concerns about tax issues. (*Id.* at ¶¶ 162, 164).

On March 28, 2016, Plaintiff wrote to Burgess expressing concerns about the New York corporate apartments and tax withholding issues. (Pl. Counter 56.1 ¶ 173). The parties dispute whether these issues were material to the Rep Letter. (*Id.* at ¶¶ 174-84). According to Plaintiff, he withheld his signature on ION's 2015 Audit Representation Letter, a letter "relating to the 2015 financials," due to his concerns about tax evasion. (Lavalette Decl. ¶¶ 98-108). Indeed, Plaintiff related to others at the time that he was withholding his signature because of concerns about fraud at ION. (*Id.*).

Plaintiff went on vacation in Denmark from roughly March 21, 2016, to March 30, 2016. (Pl. Counter 56.1 ¶ 166). Plaintiff indicated that he could sign the Rep Letter remotely, and that his assistant "has [his] signature stamp as a backup just in case." (*Id.* at ¶ 172). On March 29, 2016, Plaintiff was unavailable while on a flight from approximately 1:30 p.m. EST until approximately 9:00 p.m. EST. (*Id.* at ¶¶ 197-99). Plaintiff alleges that, during the time he was unavailable, Santisi and Burgess directed Plaintiff's assistant to use Plaintiff's signature stamp to sign the Rep Letter, without obtaining proper authorization from Plaintiff. (*Id.* at ¶¶ 201-02). Shortly after landing, at 11:00 p.m. EST, Plaintiff wrote an email to Burgess, Santisi, and then-General Counsel Michael Hubner stating that he "did not authorize" the use of his signature stamp, and stating that he was "amazed" that Santisi had instructed his assistant to sign the letter without his permission "after all [his] comments on the rep letter and certain open items." (*Id.* at ¶ 206).

### 4.   The Discriminatory Conduct

Separate and apart from the above-described tax fraud, Plaintiff claims that the work environment at ION was suffused with discrimination.  Plaintiff recalled that Burgess and Santisi engaged in offensive and discriminatory conduct in the workplace, and that Plaintiff repeatedly spoke out against this conduct.  For instance, Plaintiff alleges that when Burgess "mocked" and "imitated" an employee in a racially offensive manner, Plaintiff stated, "Brandon, stop."  (Pl. Counter 56.1 ¶ 319).  At another time, Burgess stated that a minority employee was not "smart enough," causing Plaintiff to remark to Burgess that the employee was "competent."  (*Id.* at ¶ 321).  According to Plaintiff's testimony, on multiple occasions Burgess observed that job candidates were from the "wrong gene pool," and Plaintiff responded by saying, "Come on[,] Brandon."  (*Id.* at ¶¶ 322-23).  Similar incidents occurred in which Burgess and Santisi made racially insensitive or offensive comments, and Plaintiff responded with rebukes.  (*Id.* at ¶¶ 324-29).

### 5.   The Alleged Retaliation and the End of Plaintiff's Employment

In January 2016, Burgess directed ION to give Plaintiff a bonus of $15,000.  (Pl. Counter 56.1 ¶ 148).  Burgess represented to Plaintiff that the bonus was a "recognition of the year-end imperfections we had to deal with and for which you went out of your way."  (*Id.* at ¶ 149).  Plaintiff believes that the bonus was Burgess's way of sending him "flowers" after "berating" him regarding the tax basis issue.  (*Id.* at ¶ 150).  Burgess also gave Plaintiff a gift card of approximately $500 in January 2016. (*Id.* at ¶ 152).  ION's true

estimation of Plaintiff, however, was made plain in February 2016: Plaintiff received a bonus of $285,000, which he contends was the lowest rate among his peers and substantially less than the bonus to which he was entitled. (*Id.* at ¶ 153).

On March 30, 2016, Plaintiff informed Board member Parker that he was being "stonewalled" on tax issues; notified Parker about tax evasion with respect to the use of Perks; and informed Parker about tax evasion with respect to the Tax Basis Calculations. (Pl. Counter 56.1 ¶¶ 225-26). During the same phone call, Plaintiff also raised concerns about "discriminatory behavior" on the part of Burgess and Santisi. (*Id.* at ¶ 227). After Plaintiff raised these concerns, Parker responded simply, "you won't survive here anymore, Burgess won't allow it." (*Id.* at ¶ 231). That same day, Plaintiff emailed Burgess, to report (with apologies to Mark Twain) that rumors of Plaintiff's resignation were grossly exaggerated. (*Id.* at ¶ 242).[2] On April 10, 2016, Burgess notified the Board that he was trying to find a "productive path," and work to "help [Plaintiff] perform his role successfully." (*Id.* at ¶ 245). However, Burgess later cancelled Plaintiff's corporate car service. (*Id.* at ¶¶ 306-09).

Plaintiff had previously begun interviewing for a position with the New York Racing Association ("NYRA") in January 2016. (Pl. Counter 56.1 ¶¶ 331-35). Plaintiff continued interviewing and negotiating with NYRA throughout

---

[2] *See* Albert Bigelow Paine, MARK TWAIN: A BIOGRAPHY Ch. 198 ("You don't need as much as that,' [Clemens] said. 'Just say the report of my death has been grossly exaggerated.'").

the first three months of 2016, verbally accepting a written offer of employment from NYRA on May 4, 2016. (*Id.* at ¶¶ 336-49). Burgess and ION made certain efforts to keep Plaintiff at ION, indicating that Plaintiff's departure would not be good for the company, but were ultimately unsuccessful. (*Id.* at ¶¶ 350-53). Plaintiff signed the NYRA offer on May 7, 2016, and on May 9, 2016, he verbally informed Burgess that he was leaving. (*Id.* at ¶¶ 354-57). On May 11, 2016, Burgess told ION's Board that he was "unable to retain [Plaintiff]." (*Id.* at ¶ 356). On May 13, 2016, ION's General Counsel sent Plaintiff an unsigned separation agreement. (*Id.* at ¶ 363). Plaintiff's last day of work at ION was May 20, 2016. (*Id.* at ¶ 368).

**B.    Procedural Background**

Plaintiff filed his Complaint in this action on September 19, 2016 (Dkt. #1), followed by the Amended Complaint on December 6, 2016 (Dkt. #3), and a Second Amended Complaint on April 25, 2017 (Dkt. #26). Defendants answered on May 24, 2017. (Dkt. #34). Following the close of discovery, on September 28, 2018, Defendants filed motions for summary judgment and to exclude expert reports and testimony. (Dkt. #91, 102). Plaintiff filed opposition briefs to both motions on November 12, 2018. (Dkt. #111, 115). Defendants filed their reply briefs on December 21, 2018. (Dkt. #128, 131).

Also on December 21, 2018, Defendants filed a motion to strike. (Dkt. #133). Plaintiff filed an opposition brief to the motion to strike on January 23, 2019. (Dkt. #138). Defendants filed their reply brief on February 13, 2019. (Dkt. #143).

**DISCUSSION**

**A.    The Court Denies Defendants' Motion for Summary Judgment**

Plaintiff brings claims for retaliation under the NYCHRL and the NYFCA, and for breach of contract. Defendants argue that Plaintiff cannot show either retaliation or breach of contract because, in Defendants' view, Plaintiff resigned from his employment at ION after suffering no adverse actions. Accepting Defendants' position at this stage of the litigation, however, would require the Court to draw inferences in favor of Defendants in contravention of Rule 56. The Court's evaluation of the record shows that genuine disputes of material fact exist as to whether Plaintiff was terminated rather than resigned; whether he was terminated without cause; and whether he suffered adverse actions as a result of engaging in protected activities. Accordingly, and for the reasons stated below, Defendants' motion for summary judgment is denied.

**1.    Motions for Summary Judgment Under Rule 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[3] A fact is "material" if it "might affect the outcome of the suit under the governing

---

[3]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. See Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing Anderson).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts*," Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the

true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

In their reply papers, Defendants ask the Court to disregard certain assertions made by Plaintiff as inconsistent with his deposition testimony. (*See* Def. Reply 2). Though the Court perceives a certain tension, if not inconsistency, between portions of Plaintiff's Declaration and his prior testimony, it concludes that it is inappropriate to disregard those portions of the Declaration entirely. In deciding a motion for summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'" *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Hayes* v. *N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). But to that general rule, the Second Circuit has recognized an exception:

> in the rare circumstance where the plaintiff relies
> almost exclusively on his own testimony, much of
> which is contradictory and incomplete, it will be
> impossible for a district court to determine whether
> "the jury could reasonably find for the plaintiff," and
> thus whether there are any "genuine" issues of material
> fact, without making some assessment of the plaintiff's
> account.

*Jeffreys*, 426 F.3d at 554 (internal citation omitted) (quoting *Anderson*, 477 U.S. at 252). In this rare setting, a court considering a summary judgment motion may make credibility determinations. *See SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017). Even then, the Second Circuit has cautioned that, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426 F.3d at 555 n.2 (emphasis and citation omitted). Instead, such credibility assessments are to be reserved for "extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility." *Rojas*, 660 F.3d at 106 (citation and quotation marks omitted).

**2.    Genuine Disputes of Material Fact Exist as to Whether There Was an Involuntary or Constructive Termination of Plaintiff's Employment**

**a.    Applicable Law**

"[A]n actual discharge ... occurs when the employer uses language or engages in conduct that would logically lead a prudent person to believe his tenure has been terminated." *Chertkova* v. *Ct. Gen. Life Ins. Co.*, 92 F.3d 81, 88 (2d Cir. 1996) (internal citation and quotation marks omitted). The

"[i]nquiry focuses on the reasonable perceptions of the employee, not on whether formal words of firing were in fact spoken." *Id.* "Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Morris* v. *Schroder Capital Mgmt. Int'l*, 7 N.Y.3d 616, 621-22 (2006) (internal citation and quotation marks omitted).

### b. Analysis

Defendants look at the proffered evidence of Plaintiff's termination from ION and find it to be inadequate as a matter of law. In particular, Defendants find the following evidence to be insufficient, whether considered individually or collectively: (i) a March 30, 2016 statement by Board member Parker, the individual who had hired Plaintiff, to the effect that "you won't survive here anymore, Burgess won't allow it"; (ii) the existence and contents of a draft separation agreement that ION sent to Plaintiff on May 13, 2016; and (iii) a severance offer made by CEO Burgess to Plaintiff. (*See* Def. SJ Br. 9-12). The Court disagrees.

To start, Defendants assert that Plaintiff could only have understood Parker's statement "as a warning." (Def. SJ Br. 10 (citing Def. 56.1 ¶ 232)). Plaintiff disputes this, contending that he "reasonably understood" the statement to mean he was being terminated. (Pl. Counter 56.1 ¶ 232). Even were Defendants' gloss undisputed, which it is not, drawing all inferences in favor of Plaintiff and considering the evidence in the record cumulatively, a warning statement of this type from Parker could have been one element of a

series of events that led Plaintiff to believe he was facing imminent termination.

Defendants further argue that the separation agreement cannot show involuntary termination because ION sent it to Plaintiff after its General Counsel had learned that Plaintiff was leaving and after Plaintiff had accepted another job, and because the "document constitutes an inadmissible offer of compromise" under Federal Rule of Evidence 408. (Def. SJ Br. 10-11). However, the fact of a draft separation agreement, irrespective of its contents, *does* support an inference that the parties were contemplating separation prior to the delivery of the agreement. That inference, when considered cumulatively with other evidence, could help to establish that the contemplated separation of Plaintiff was, at least to him, involuntary.

Indeed, Plaintiff turns Defendants' argument on its head, noting that the separation agreement states expressly that Defendants "terminate[d] Lavalette's employment," when it could have stated that Plaintiff resigned, and when *other* employee separation agreements did state that the employee resigned. (*See* Pl. SJ Opp. 17). Defendants have not met their burden to establish that the portions of the agreement referencing termination are inadmissible settlement information. *Cf. Cassino* v. *Reichhold Chems., Inc.*, 817 F.2d 1338, 1342-43 (9th Cir. 1987) ("W]hen an employment relationship is terminated and the employer offers a contemporaneous severance pay package in exchange for a release of all potential claims … [s]uch termination agreements are generally made a part of the record in the case and are

considered relevant to the circumstances surrounding the ... discharge itself."). Likewise, Federal Rule of Evidence 408 does not bar the admission of the fact that the agreement contained termination language when, as here, that language is introduced as evidence of whether a reasonable person in Plaintiff's position would have believed he or she was being terminated.

Finally, Defendants assert that Burgess's severance offer "cannot establish an involuntary termination" because it was a response to Plaintiff's prior offer to negotiate a "mutually agreeable path forward." (Def. SJ Br. 11-12). Defendants misquote their own statement of material facts, which asserts that Plaintiff had made a prior offer for "a 'mutually-agreeable' severance package." (Def. 56.1 ¶ 347). More importantly, the existence of prior ongoing conversations between Plaintiff and Burgess as to the terms of Plaintiff's separation is not mutually exclusive with a finding that Plaintiff reasonably understood he had been involuntarily terminated. After all, Plaintiff may have simply been attempting to negotiate a soft landing following such termination.

Relatedly, Defendants attempt to rely on gaps in the evidentiary record, and on portions of the evidence in the record that favor Defendants, to assert that the record is insufficient to support a finding that Plaintiff was involuntarily terminated from his employment. *First*, Defendants contend that "Plaintiff effectively admits no one at ION told him he was "'fired.'" (Def. SJ Br. 9 (citing Def. 56.1 ¶ 361)). Plaintiff disputes that fact, pointing to testimony that Defendants told Plaintiff "that [he] was done." (Pl. Counter 56.1 ¶ 361). Yet, even if the fact were undisputed, it would not provide a

persuasive basis to rule for Defendants. That the word "fired" is not a part of Plaintiff's evidence of involuntary termination does not negate the evidence Plaintiff has shown of the same. *See, e.g.*, *Chertkova*, 92 F.3d at 88 ("Inquiry focuses on the reasonable perceptions of the employee, not on whether formal words of firing were in fact spoken."). *Second*, Defendants assert that, because ION provided assurances about Plaintiff's job and made certain alleged efforts to retain him, the evidence in the record cannot support a finding of involuntary termination. (Def. SJ Br. 9-10). These arguments also fail. That some evidence in the record points away from a finding of involuntary termination does not mean that other evidence favoring Plaintiff is insufficient as a matter of law to support such a finding.

Because the Court finds sufficient evidence in the record to support an inference that Plaintiff was involuntarily terminated from his employment, the Court need not consider whether the record also supports an inference of constructive discharge. Nonetheless, for the sake of completeness, the Court undertakes this analysis as well. Defendants argue that Plaintiff cannot show constructive discharge because it is undisputed that "Plaintiff denies resigning." (Def. SJ Br. 12 (citing Def. 56.1 ¶ 372); *see also* Pl. Counter 56.1 ¶ 372). Yet, it is possible to maintain simultaneous claims for actual discharge and constructive discharge, and thus a plaintiff's denial of resignation in the context of making a claim for involuntary termination need not preclude a claim for constructive discharge. *See Chertkova*, 92 F.3d at 88-90.

Defendants further contend that there is insufficient evidence in the record to support a finding of "intolerable conditions." (*See* Def. SJ Br. 13). Defendants characterize the evidence that might support such a finding as the warning from Parker, plus inconvenience and alteration of job responsibilities in the form of a loss of Plaintiff's corporate car service and management's refusal to approve an employee's promotion. (*See id.* at 13-14). Yet, the record contains more evidence supporting an inference of intolerable conditions than Defendants admit. In addition to the evidence that Defendants highlight, Plaintiff alleges that, "in February 2016, Defendants began falsely criticizing and undermining him and taking away his responsibilities." (Pl. SJ Opp. 16-17). Burgess then began creating false rumors that Plaintiff had resigned, and began giving "scathing negative written reviews of [Plaintiff] to the Board," as well as limiting Plaintiff's job responsibilities, canceling his car service, and reducing his assistant's access to team emails and calendar information. (*Id.*). Plaintiff adds that the alleged forging of his signature left him fearing "personal liability, including potential criminal liability[.]" (*Id.* at 20). A reasonable jury could rely on these facts to conclude that Plaintiff was "marginalized, humiliated, and threatened" (*id.*), to the point that his working conditions became "intolerable," *Morris*, 7 N.Y.3d at 622.

## 2. Genuine Disputes of Material Fact Exist as to Whether Plaintiff Was Terminated Without Cause

### a. Applicable Law

Paragraph 3(b) of Plaintiff's Stock Appreciation Rights Agreement (the "SARs Agreement") states: "In the event of a Participant's death or if the Participant's employment is terminated by the Company without Cause (including due to disability), any vested portion of this SAR shall remain outstanding and become exercisable in accordance with Section 2 hereof." (Stieber Decl., Ex. J at § 3(b)).  Accordingly, Plaintiff's claim for breach of contract depends on his showing that his employment was terminated "without Cause."  Paragraph 11 of the SARs Agreement further states:  "Any questions as to whether and when there has been a termination of Participant's employment and the cause of such termination shall be determined in the sole discretion of the Committee."  (*Id.* at § 11).

### b. Analysis

Defendants contend that Plaintiff's breach of contract claim must fail because the record is insufficient to show that Plaintiff was terminated "without Cause."  (*See* Def. SJ Br. 29).  As before, Defendants argue primarily that Plaintiff was not terminated at all, but rather resigned.  (*See id.*).  In the alternative, Defendants note that the ION "Compensation Committee has the 'sole discretion' to decide whether 'there has been a termination of [Plaintiff's] employment and [its] cause[.]'"  (*Id.*).  From this, Defendants contend that the record cannot show that the Compensation Committee "acted in bad faith or

abused its discretion in concluding Plaintiff did not suffer a termination 'without Cause.'" (*Id.*).

Defendants are correct that the SARs Agreement specifies that the Compensation Committee will determine whether and when a termination took place, and the cause thereof. (*See* Stieber Decl., Ex. J at § 11). However, Plaintiff is also correct that there are disputes of material fact as to whether the Compensation Committee reached a determination, what determination they reached, and whether that determination was reached in good faith. (*See* Pl. SJ Opp. 29). In support, Plaintiff points out that the sole evidence supporting Defendants' position, i.e., that the Committee concluded that Plaintiff resigned, is Parker's declaration (*see* Parker Decl. ¶ 4), and that Parker's credibility is undercut by his position in the organization and, more importantly, by prior statements made to Plaintiff (*see* Pl. SJ Opp. 29 (citing Pl. Counter 56.1 ¶¶ 459-92)). Drawing all inferences in favor of Plaintiff, as the Court must, reasonable factfinders could reject Parker's statement. Further, because Defendants have not shown conclusively that any termination Plaintiff may have suffered would necessarily have been "for cause," the very same evidence in the record that supports a finding that Plaintiff was terminated, either actually or constructively, also supports a finding that the termination was without cause.

The Court agrees with Plaintiff that, because there are disputes of material fact as to whether Plaintiff was "actively or constructively terminated," there is also a genuine dispute as to whether he was terminated

for cause. (*See* Pl. SJ Opp. 28). For both reasons, Defendants' motion for summary judgment regarding Plaintiff's breach of contract claim is denied.

### 3. Genuine Disputes of Material Fact Exist as to Whether Plaintiff Suffered Adverse Actions Because He Engaged in Protected Activity

#### a. Applicable Law

To establish a claim for retaliation under the New York False Claims Act, N.Y. State Fin. Law § 191 ("NYFCA"), Plaintiff "must show that Defendants retaliated against him because of [] protected conduct." *Plotzker* v. *Kips Bay Endoscopy Ctr., LLC*, No. 12 Civ. 9255 (GBD), 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017), *aff'd sub nom. Plotzker* v. *Kips Bay Anesthesia, P.C.*, 745 F. App'x 436 (2d Cir. 2018) (summary order) (internal quotation omitted). "Courts generally require a plaintiff to show that [i] he engaged in activity protected under the statute, [ii] the employer was aware of such activity, and [iii] the employer took adverse action against him because he engaged in the protected activity." *Dhaliwal* v. *Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order). If Plaintiff produces evidence sufficient to support a *prima facie* case for retaliation, the burden shifts to Defendants to produce evidence of a non-discriminatory reason for its actions, following which the burden shifts back to Plaintiff to show that Defendants' "stated reason is a pretext for retaliation." *Plotzker*, 2017 WL 4326061, at *7 (applying the burden-shifting framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-04 (1973), to an NYFCA claim); *see also State ex rel. Seiden* v. *Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (1st Dep't 2012) ("Because the NYFCA

mirrors the FCA in many respects, it is appropriate to look toward federal law when interpreting the New York act.")

### b. The Protected Activity and ION's Notice Thereof

For purposes of establishing the initial prong of an NYFCA claim, protected activity includes "efforts to stop one or more violations" of the NYFCA. *See* N.Y. State Fin. L. § 191(2); *New York ex rel. Khurana* v. *Spherion Corp.*, No. 15 Civ. 6605 (JFK), 2016 WL 6652735, at *17 (S.D.N.Y. Nov. 10, 2016). A plaintiff must show "a good faith basis or an objectively reasonable basis for believing that … [the plaintiff] was investigating matters in support of a viable FCA case." *Krause* v. *Eihab Human Servs., Inc.*, No. 10 Civ. 898 (RJD) (SMG), 2015 WL 4645210, at *6 (E.D.N.Y. Aug. 4, 2015) (internal quotes omitted). Some courts have held that, where a plaintiff's efforts to stop fraud are closely related to his normal employment duties, the plaintiff must show that "his complaints of noncompliance … went beyond the performance of his normal job responsibilities so as to overcome the presumption that he was merely acting in accordance with his employment obligations." *Landfield* v. *Tamares Real Estate Holdings, Inc.*, 976 N.Y.S.2d 381, 382 (1st Dep't 2013). Other courts have declined to apply this heightened notice standard to NYFCA claims. *See, e.g.*, *United States* v. *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 299-300 (E.D.N.Y. 2016); *Malanga* v. *N.Y. Univ.*, No. 14 Civ. 9681 (WHP), 2018 WL 333831, at *2-3 (S.D.N.Y. Jan. 9, 2018); *Swanson* v. *Battery Park City Auth.*, No. 15 Civ. 6938 (JPO), 2016 WL 3198309, at *5 (S.D.N.Y. June 8, 2016).

There are three instances of purported protected activity at issue here. Plaintiff contends that he blew the whistle on fraud within ION, which took the form of (i) improper deductions from taxes due as a result of the discharge of debt in bankruptcy (the "Tax Basis Calculations"); (ii) improper tax withholdings concerning the New York residency of various executives (the "Tax Withholdings"); and (iii) improper use of company perks (the "Perks"). Specifically, Plaintiff argues that the record raises triable issues that he discovered "a $30 million tax evasion"; "caused EY to acknowledge the problem"; "discovered that Burgess had refused to provide information EY requested and did not allow EY to do a thorough tax review"; and blew the whistle on these tax-reporting violations as well as ION's payroll tax evasion violations. (Pl. SJ Opp. 22-23).

As to the second prong of the NYFCA claim, Plaintiff contends that he put ION on notice of his protected conduct by refusing to sign the 2015 Audit Representation Letter and by reporting his findings to Burgess, the General Counsel, an ION Board Member, and an individual outside the company. (*See* Pl. SJ Opp. 23). The Court finds the record sufficient to support a reasonable jury's conclusion that Plaintiff engaged in protected activity of which ION was on notice. Defendants' arguments to the contrary, discussed below, do not alter the Court's conclusion.

### i.     The Tax Basis Calculations

Regarding the Tax Basis Calculations, Defendants argue that Plaintiff merely asked questions of EY in the course of undertaking his normal

24

employment obligations to prepare materials for the potential deal with Sinclair; that it was Sinclair's attorney who actually discovered the tax basis miscalculation; and that the error does not qualify as tax fraud because it resulted in ION *overpaying* taxes. (*See* Def. SJ Br. 17-18). Defendants argue, for example, that "Plaintiff supplies nothing to support that, when he asked EY questions, he believed in 'good faith' that ION had 'committ[ed] a fraud,' that a 'reasonable employee' would have thought so, or that he was taking steps to stop fraud." (*Id.* at 17). Yet, as Plaintiff points out, evidence in the record shows that Plaintiff was investigating the Tax Basis Calculations months before the discussions with Sinclair. Plaintiff identified not merely the miscalculation, but also ION's allegedly improper instruction to EY regarding ION's financial status, for which it did not make supporting documentation available during the audit. (*See* Lavalette Decl. ¶¶ 71-89). Plaintiff notified Burgess, the General Counsel, and an individual outside of ION about this potential issue. (*See id.*). Defendants effectively ask the Court to make a credibility determination as to Plaintiff's assertions. At this stage of the litigation, however, the record must be read in Plaintiff's favor, and in doing so the Court finds a dispute of material fact concerning whether Plaintiff engaged in protected whistleblowing over a good-faith belief that the Tax Basis Calculations were fraudulent.

### ii.     The Tax Withholdings

As to the Tax Withholdings, Defendants assert a number of reasons why

Plaintiff's proffered evidence is insufficient as a matter of law.  These reasons

are set forth in bullet-point form for ease of reference:

- Plaintiff's activities investigating ION's tax compliance were part of his normal job responsibilities, undertaken at the instruction of his superiors.

- No evidence supports Plaintiff's good-faith belief that ION was under-withholding taxes for New York residents.

- Even if Plaintiff were able to show a good-faith belief that the withholdings were inaccurate, he could not show a similar belief that the withholdings were fraudulent.

- Even if Plaintiff were able to show a good-faith belief that ION engaged in fraudulent under-withholdings, he cannot show that such withholdings exceeded $350,000, which Defendants contend is the minimum threshold to bring a NYFCA claim.

- Plaintiff's withholding of his signature from the Rep Letter cannot show a good-faith belief that the documents furthered a tax fraud.

- Plaintiff's alleged accusation that Burgess and ION engaged in tax evasion during a phone call with Parker does not qualify as protected activity.  Further, since the record shows that Burgess was unaware of this accusation, such activity cannot support a claim of retaliation.

(*See* Def. SJ Br. 20-21).

The Court begins by considering the $350,000 threshold.  Section 189 of

the NYFCA states: "This section shall apply to claims ... made under the tax

law only if ... the damages pleaded in such action exceed three hundred and

fifty thousand dollars."  N.Y. State Fin. L. § 189(4)(a).  Defendants read this

section to specify a $350,000 monetary threshold to establish any type of NYFCA violation for tax fraud. (*See* Def. SJ Br. 20-21; Def. SJ Reply 9). Plaintiff disagrees, arguing that the $350,000 threshold applies solely to *qui tam* actions brought for violations of the NYFCA, and does not otherwise restrict the definition of an NYFCA violation for other causes of action, such as the retaliation claim at issue in the instant matter. (*See* Pl. SJ Opp. 24-25).

Neither party cites to controlling or persuasive case law in support of their position, and the Court's independent research has identified none. However, the plain language of the anti-retaliation provision of the NYFCA states that individuals are to be protected from retaliation not merely when they bring a viable *qui tam* action, which would require meeting the $350,000 threshold for tax fraud violation, but also when they engaged in "lawful acts done ... in furtherance of" such an action. N.Y. State Fin. L. § 191(1)-(2). The Court reads this language to establish protections against retaliation that are broader than the requirements for bringing a *qui tam* claim, and that include "lawful acts done ... in furtherance of" a possible *qui tam* action, even if the individual retaliated against does not ultimately discover or bring a viable *qui tam* claim. Thus, the $350,000 threshold does not apply to Plaintiff's retaliation claims.

Moving to the remainder of Defendants' arguments concerning the Tax Withholdings, Plaintiff avers that "payroll tax matters were *not* part of his responsibilities" (Lavalette Decl. ¶¶ 28-31); that his refusal to sign the Rep Letter was based on concerns about possible tax fraud (*id.* at ¶¶ 96-98); and

that he put ION on notice of the issue by reporting his concerns to both Parker and ION's General Counsel (*id.* at 116-19). This evidence suffices to raise genuine disputes of fact concerning Plaintiff's good-faith belief in the existence of tax fraud, and concerning ION's notice of Plaintiff's protected activity in investigating and disclosing any such fraud.

### iii.    The Perks

Finally, Defendants argue that the record is insufficient to support a finding that Plaintiff engaged in whistleblowing regarding ION's alleged failure to report company perks as taxable income. Defendants interpret Plaintiff's questions about "open items" and his recommendation to "confirm proper treatment" as nothing more than the fulfillment of his normal job responsibilities undertaken upon orders from his superiors; they assert that any tax issues with the reporting of Perks failed to meet the $350,000 threshold; and they argue that Plaintiff cannot show he gave notice to the employer because he "never told ION that he was 'investigating fraud,' as opposed to simply wanting to confirm the correct tax treatment in his CFO capacity." (Def. SJ Br. 21-22).

The Court has already determined that Plaintiff's claims need not meet the $350,000 threshold. Defendants' other arguments fail because they require inferences to be drawn in their favor as moving parties, which Rule 56 proscribes. Reading the record in favor of Plaintiff, the Court credits Plaintiff's statements that payroll tax matters were not part of his normal job responsibilities; that Plaintiff specifically notified Burgess, the General

Counsel, and others that he was withholding his signature on the Rep Letter due to concerns about tax improprieties; and that he notified Parker about possible tax evasion at ION. (*See* Lavalette Decl. ¶¶ 28-31, 98-17). These actions constitute protected activity and notice thereof.

### c. The Purported Retaliatory Actions

Defendants argue that the record fails to support a finding of either a *prima facie* case of retaliation or of pretext. (*See* Def. SJ Br. 15). To begin, Defendants contend that Plaintiff cannot establish that his employment was terminated. (*See id.* at 22). The Court has already determined otherwise. Termination is an adverse action for purposes of the establishing retaliation, so Plaintiff can establish adverse action from that alone. Contrary to Defendants' assertions (*see id.* at 24), the allegations that Defendants terminated Plaintiff's car service, restricted the scope of his job responsibilities, and provided "scathing reviews" add more support for Plaintiff's showing of adverse action.

Next, Defendants advance the position that, even if Plaintiff had been terminated, "ION had a legitimate non-retaliatory reason for ending his employment: it understood that Plaintiff resigned." (Def. SJ Br. 22). Defendants rely on assertions from Burgess's deposition stating that he understood Plaintiff to have resigned. (*See id.* (citing Def. 56.1 ¶ 360)). But Plaintiff disputes that this was, in fact, Burgess's understanding (*see* Pl. Counter 56.1 ¶ 360), raising a credibility challenge that the Court cannot resolve at this stage of the litigation. And, contrary to Defendants' assertions

(*see* Def. SJ Br. 23), the gap of two months or more between the alleged protected activity — Plaintiff's "'tax evasion' remarks"— and the adverse actions does not foreclose a showing of causation. Accordingly, Defendants' motion for summary judgment as to Plaintiff's NYFCA claims is denied.

### 4. Genuine Disputes of Material Fact Exist as to Plaintiff's NYCHRL Claim

"To make out a prima facie case of retaliation under the [NYCHRL], [a] plaintiff [is] required to show that [i] she participated in a protected activity known to defendant; [ii] defendant took an action that disadvantaged her; and [iii] a causal connection exists between the protected activity and the adverse action." *Cadet-Legros* v. *N.Y. Univ. Hosp. Ctr.*, 21 N.Y.S.3d 221, 230 (1st Dep't 2015) (internal quotation marks, citations, and alterations omitted). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims[.]" *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). "[P]rotected activity includes informal protests of discriminatory employment practices, including making complaints to management." *Dillon* v. *Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 659 (E.D.N.Y. 2015) (quoting *Benedith* v. *Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 322 (E.D.N.Y. 2014)).

Defendants seek summary judgment in their favor on Plaintiff's NYCHRL claim on the basis that Plaintiff has failed to show evidence that (i) he engaged in protected activity; (ii) any protected activity he might have engaged in was known to his employer; (iii) ION took action that disadvantaged him; (iv) Plaintiff was subject to a hostile work environment; and (v) Burgess

engaged in any retaliatory conduct. (*See* Def. SJ Br. 26-28). Once again, accepting Defendants' arguments would require the Court to make credibility determinations and to draw inferences in favor of Defendants, neither of which is permitted on a motion for summary judgment.

For instance, Defendants concede that evidence in the record supports Plaintiff's allegations that he made a general accusation of "discriminatory behavior" to Parker, and that he rebuked Burgess on three specific occasions for making offensive comments apparently targeted at racial minority employees and job candidates. (*See* Def. SJ Br. 27). Defendants argue, nevertheless, that Plaintiff's rebukes of Burgess in the form of "saying 'stop' or 'Come on' [are] not enough to be protected activity and [do] not express whether Plaintiff opposed the remarks because he believed they were based on 'membership in a protected class,' or simply because he considered them unfair or unprofessional." (*Id.*). Yet, precisely what Plaintiff believed or intended to express at the time he made these statements is a material dispute of fact that the Court cannot resolve at this stage of the litigation. And in terms of retaliatory action, the Court has already determined that the record supports an inference that Plaintiff was involuntarily terminated; that alone would be sufficient to show that ION took action that disadvantaged him. Finally, the record supports a finding that Plaintiff's rebukes of Burgess responded to arguably discriminatory conduct *by Burgess*, and that Burgess engaged in retaliatory conduct, including but not limited to reducing the scope of Plaintiff's job responsibilities, terminating Plaintiff's car service, and

31

constructively terminating Plaintiff's employment. Thus, Burgess could be found individually liable for the NYCHRL claim. For these reasons, Defendants' motion for summary judgment as to Plaintiff's NYCHRL claim is also denied.

### 5. Genuine Disputes of Material Fact Exist as to Whether Plaintiff Satisfied His Duty to Mitigate Damages

In addition to challenges to Plaintiff's liability arguments, Defendants also challenge whether Plaintiff is entitled to damages, beginning with a claim that Plaintiff failed to mitigate his damages. "[A]n employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate." *Broadnax* v. *City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005). In general, the employer makes this showing by demonstrating "[i] that suitable work existed, and [ii] that the employee did not make reasonable efforts to obtain it." *Id.* (citation omitted). However, "[a]n employer … is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." *Greenway* v. *Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998).

Defendants claim that Plaintiff failed to mitigate damages because it is undisputed that (i) Plaintiff accepted the job at NYRA before leaving ION; and (ii) Plaintiff did not attempt to find a higher-paying job thereafter. (*See* Def. SJ Br. 28). On this point, Defendants rely on *Arbercheski* v. *Oracle Corp.*, 650 F. Supp. 2d 309 (S.D.N.Y. 2009), in which a sister court in this District found that a plaintiff failed to take reasonable efforts to mitigate damages where,

despite initially interviewing for one position and engaging in conversations with other prospective employers, the plaintiff accepted a waitress position and then "ceased all efforts to obtain other employment comparable to her previous job." *Id.* at 313-14. Here, Defendants argue, Plaintiff seeks damages in the form of alleged lost wages, and yet he "has made no attempt since leaving ION to secure a job with the same pay and benefits." (Def. SJ Br. 29).

Plaintiff disputes whether his acceptance of the CFO position at NYRA constituted a reasonable effort to find comparable employment. (*See* Pl. SJ Opp. 28). He also cites his own averments that he *did* continue to investigate other job opportunities, even after accepting the position at NYRA. (*See id.*). Specifically, Plaintiff declares that, "[e]ven after I signed the offer letter with NYRA, I continued to explore other job opportunities. For example, in June 2016, I was in communication with a recruiter from Resource Management Group, a leading search firm for Financial Officers, about potential employment opportunities." (Lavalette Decl. ¶ 154). The reasonableness of the NYRA CFO position as alternative employment to the ION CFO position, and the credibility of Plaintiff's description of additional efforts to find alternative employment, are issues for the jury.

### 6. The Court Will Not, at This Stage in the Litigation, Limit Plaintiff's Entitlement to Damages

Separately, Defendants argue that, even if Plaintiff were to prevail on his breach of contract claim by establishing that he was terminated without cause, the SARs Agreement would not entitle him to exercise his vested SARs now; to retain any yet-unvested SARs; or to obtain dividends. (*See* Def. SJ

Br. 29-30). Defendants assert that the plain language of the Agreement states that, in the event of termination without cause, Plaintiff's vested SARs "remain outstanding and become exercisable" only upon a "Change in Control" or the 10th anniversary of the grant date, while his unvested SARs terminate and expire. (*Id.* at 30 (citing Def. 56.1 ¶¶ 380-81, 388)). Any vested SARs to which Plaintiff *is* entitled must, in Defendants' view, be valued at the date of the alleged breach of contract, rather than at today's date. (*Id.*). And, according to Defendants, the Agreement does not entitle Plaintiff to any dividends because it does not grant him "any rights as a shareholder." (*Id.* (citing Def. 56.1 ¶¶ 393-94)).

Plaintiff responds that Defendants' argument amounts to the position that Plaintiff's remedies should be limited to specific performance of his contract, whereas generally money damages are awarded for breach of contract, even where the breach is a failure to deliver stock options. (*See* Pl. SJ Opp. 29-30). *See Lucente* v. *Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) ("[B]efore the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice."). Further, if Plaintiff succeeds on his NYFCA and NYCHRL claims, his damages on those claims may encompass compensation for his unvested SARs. (*See* Pl. SJ Opp. 30).

Defendants do not respond to Plaintiff's contention that he is entitled to broad damages on his NYFCA and NYCHRL claims. (*See* Def. SJ Reply 19-20).

Regarding the breach of contract claim, Defendants rely on language from the Delaware Supreme Court to argue that Plaintiff should be put in the "same position as if [ION] had performed the contract." (*See id.* at 20 (citing *Siga Techs., Inc.* v. *PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015))).  While Defendants are correct to apply Delaware law to the contract at issue here, they misrepresent the language in *Siga Technologies*; the court in that matter was discussing how to evaluate expectation damages for breach of contract claims, and commented that the damages should be "measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Siga Techs.*, 132 A.3d at 1130.  In other words, the *Siga Technologies* court was contemplating monetary damages, not solely specific performance.  As a result, the Court finds Defendants' arguments unpersuasive, and declines at this stage of the litigation to limit Plaintiff's available remedies on his claims.

**B.      The Court Denies Defendants' Motion to Strike**

Separate from their motion for summary judgment, Defendants also move to strike certain paragraphs of Plaintiff's Local Rule 56.1 Response and Counter-Statement of Undisputed Facts.  (*See* Def. Strike Br. 1).  Local Civil Rule 56.1 requires that the movant file a "short and concise statement ... of the material facts as to which the moving party contends there is no genuine issue to be tried," and further provides that each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph" that "contain[s] a separate, short and concise statement of

additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(a)-(c). Statements and counterstatements alike must be supported by citations to admissible evidence. *Id.* at 56.1(d). Reviewing these materials, a district court "must ask not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). "The principles governing admissibility of evidence do not change on a motion for summary judgment …. [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

Defendants argue that Plaintiff impermissibly relies on the following categories of inadmissible evidence in his Rule 56.1 Counter-Statement: (i) material protected by the attorney-client privilege; (ii) irrelevant, inflammatory, and unduly prejudicial assertions; and (iii) factual allegations that Plaintiff previously abandoned and for which he refused to produce discovery. (*See* Def. Strike Br. 1-2). Defendants urge the Court to either strike, or in the alternative disregard, these portions of Plaintiff's Rule 56.1 Counter Statement. (*See id.* at 2).

Turning to the first category of challenged materials, Defendants contend that the following evidence is protected by the attorney-client privilege: a June 18, 2014 memorandum prepared by Seyfarth Shaw providing tax law advice; and legal advice from Michael Hubner rendered on April 19,

2016. (*See* Def. Strike Br. 4). After reviewing Plaintiff's materials in opposition, Defendants assert that the following portions contain or rely on privileged material: paragraphs 34, 50, 52, 57, 80-81, 104, 121, and 129 of Plaintiff's Declaration; exhibits 10, 43, 56, 64, 68 to that Declaration; and paragraphs 21, 26-27, 30-31, 37, 39-48, 51, 53-54, 57-58, 74-75, 102, 175, 177-78, 183, 209, 219, 221, 239, 255, 258-59, 267-69, 271, 292, 299-302, 356-57, 360, 362, 369-70, 411, 566-68, 579-81, 654-55, 720-21, 723, 763-64, and 797 of Plaintiff's Rule 56.1 Counter Statement. In deciding Defendants' motion for summary judgment, *supra*, the Court has not relied on any of this allegedly privileged evidence. Therefore, at least at this stage of the litigation, the Court need not determine whether those portions of the record are, or are not, privileged. The Court therefore denies Defendants' motion to strike these portions of the record, without prejudice to Defendants renewing the motion at trial.

Defendants also assert that allegations regarding certain former employees, certain lawful acts, certain business activities, and certain statements about Defendant Burgess's German ethnicity, have nothing to do with Plaintiff's claims or ION's defenses. (*See* Def. Strike Br. 8-10 (citing Pl. Counter 56.1 ¶¶ 26, 441, 459-93, 502, 504, 594, 596-600, 639-42, 645-52, 680, 695-98, 843-48)). Defendants claim as well that Plaintiff previously represented that he abandoned certain factual allegations, and refused to provide discovery as to those allegations, only to reassert them in the summary judgment briefing. (*See id.* at 10-12). In particular, Defendants cite

Plaintiff's "allegations regarding Santisi's alleged treatment of Lisa Bell and ION's attempt to deceive the Federal Communications Commission regarding a corporate reorganization." (*Id.* at 12 (citing Pl. Counter 56.1 ¶¶ 442, 647-52)). Here, too, the Court has not relied on any of this allegedly irrelevant or previously abandoned evidence in making its summary judgment determination, and need not now decide whether those portions of the record are relevant to the issues that remain for trial. The Court therefore denies Defendants' motion to strike these portions of the record, once again without prejudice to the reassertion of these arguments for purposes of determining admissibility at trial.

Finally, Defendants contend that the following evidence is irrelevant and non-probative: testimony about purported incidents of discriminatory conduct about which Plaintiff does not allege that he ever commented or objected, and allegations regarding "financial or regulatory improprieties for which Plaintiff does not claim he 'blew the whistle.'" (Def. Strike Br. 7-8). The Court disagrees. Evidence suggesting that discriminatory conduct occurred, even when Plaintiff was not present or did not object, makes more credible Plaintiff's testimony about observing and objecting to similar conduct in other instances. So too, evidence suggesting that financial and regulatory improprieties were occurring at ION makes more credible Plaintiff's testimony that he witnessed and objected to some of those improprieties. These aspects of Defendants' motion to strike are, therefore, denied with prejudice.

**C.    The Court Grants in Part and Denies in Part Defendants' Motion to Exclude Expert Testimony**

The Court now turns to Defendants' motion to exclude the expert reports and testimony of James A. DiGabriele with respect to his opinion on the value of any SARs to which Plaintiff may be entitled.  For the reasons detailed in this section, Defendants' motion is granted in part and denied in part.

**1.    Applicable Law**

**a.    The Court's Role as Gatekeeper**

The Supreme Court has tasked district courts with a "gatekeeping" role with respect to expert opinion testimony.  *Daubert* v. *Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993) (holding that it is the district court's responsibility to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand").  This "gatekeeping" function applies whether the expert testimony is based on scientific, or on technical or "other specialized" knowledge.  *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999).  "It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]"  *Boucher* v. *United Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation and quotation marks omitted).

Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court's inquiry thus focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact. *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

### b. Reliability of Expert Testimony

Once a court has determined that a witness is qualified as an expert, it must ensure that the expert's testimony both "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.[4] In order to be admissible, "[a]n expert opinion requires some explanation as to how the

---

[4]  In *Daubert* v. *Merrell Dow Pharmaceuticals*, the Supreme Court identified factors that may bear upon the reliability of proposed scientific testimony, including: (i) whether the theory or technique can be, and has been, tested; (ii) whether it has been subjected to peer review and publication; (iii) the known or potential error rate of the technique; (iv) the existence and maintenance of standards controlling the technique's operation; and (v) whether the technique or theory has gained widespread acceptance in the relevant scientific community. 509 U.S. 579, 593-94 (1993) (noting that these factors do not constitute "a definitive checklist or test"). In *Kumho Tire Co. Ltd.* v. *Carmichael*, the Supreme Court held that a court may apply the *Daubert* factors, as appropriate, in cases dealing with technical or "other specialized," but non-scientific, testimony. 526 U.S. 137, 141 (1999).

expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel* v. *Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008).

Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590); *see also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (finding that "[s]ubjective methodology, as well as testimony that is insufficiently connected to the facts of the case," can serve as "grounds for rejection of expert testimony"). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp.* v. *Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (citation and quotation marks omitted). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (alteration in original) (citation omitted).

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citation and quotation marks omitted). This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.* "Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

While a district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function." *Williams*, 506 F.3d at 160-61 (citation omitted). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (citation omitted). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

### c. Helpfulness or Relevance of Testimony

Finally, the Court must determine whether the proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This inquiry looks primarily to whether the testimony is relevant. *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 283. Under the Federal Rules of Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also Daubert*, 509 U.S. at 591-

92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

A court should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *United States* v. *Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States* v. *Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also Atlantic Specialty Ins.* v. *AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially that "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert").

Expert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Rule 403 inquiry is particularly important in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of

the present rules exercises more control over experts than over lay witnesses."

(quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991))).

### 3. Analysis

Defendants' motion to exclude DiGabriele's testimony and reports with respect to his opinion on SARs value distills to two main arguments: (i) DiGabriele's opinions are unsupported in contravention to the requirements of Rule 702 and *Daubert*; and (ii) his opinions are irrelevant because Plaintiff's SARs Agreement does not contemplate a cash payment for SARs, and, in any event, Plaintiff failed to mitigate damages. (*See* Def. Expert Br. 1-2). As the Court has already determined that genuine disputes of fact exist as to whether Plaintiff mitigated damages, it considers only Defendants' arguments as to Rule 702/*Daubert*, and as to relevance.

### a. The Reliability of the DiGabriele Reports

DiGabriele authored two expert reports: an initial report dated March 2, 2018 ("Report I"), and a second report dated May 1, 2018 ("Report II"). Defendants base their argument as to the reliability of Report I on the fact that DiGabriele used an undated spreadsheet, to which he assigned allegedly incorrect historical dates, to calculate the price per SAR as of January 1, 2018. (*See* Def. Expert Br. 2, 6-9). Defendants argue that DiGabriele "cannot explain the rationale for assigning the dates he did to the prices in the spreadsheet," and they maintain that at least one of the dates DiGabriele used in his calculation must be incorrect because it occurred ten months after the

date the spreadsheet itself was initially produced in an email attachment. (*See id.* at 2). Plaintiff fails to respond to this argument, instead asking the Court to "disregard" Defendants' argument as to Report I, and as to DiGabriele's March 28, 2018 deposition concerning Report I, "because DiGabriele is now relying solely on DiGabriele Report II[.]" (Pl. Expert Opp. 2). Therefore, the Court grants Defendants' motion to exclude Report I, as well as any portion of DiGabriele's testimony that relies on Report I.

Rather than relying on the undated spreadsheet, Report II relied instead on an estimated fair market value per share derived from a third party's valuation report (the "SRR Report"). (*See* Def. Expert Br. 2-3, 9). As to this second report, Defendants contend that DiGabriele's "expert" methodology is nothing more than a simple math exercise in basic calculation, and thus not useful to the jury. (*Id.* at 3). Plaintiff responds that "DiGabriele's calculations about SARs clearly involve the application of financial expertise to select complex data points from a highly technical 94 page [third party report] that defendants have neglected to put before the Court — a function that virtually no lay jurors could perform," and also involve calculating certain adjustments to the SARs base price that are "completely beyond the ken of any lay juror." (Pl. Expert Opp. 1). The Court agrees with Plaintiff that DiGabriele's selection of data points, and his calculations and adjustments using those date points, involve expertise beyond a basic lay knowledge of simple arithmetic. The Court observes as well that Defendants have not argued that DiGabriele is

unqualified as an expert. The Court find that testimony from DiGabriele as to his opinions based on Report II could be useful to the jury.

Defendants also argue that the third-party SRR Report estimation used in Report II is not the same as the valuation that ION would use in determining a price payout for Plaintiff's SARs. (*See* Def. Expert Br. 3, 9). Further, since ION's determination as to the SARs value is in the sole discretion of the ION Board, DiGabriele's opinion about how the Board might value the SARs is irrelevant. (*Id.*). Plaintiff responds that Defendants have repeatedly represented that they rely "100%" on third-party reports to assess the cash value of SARs, so judicial admission and judicial estoppel prevent them from now challenging DiGabriele's reliance on the same. (*See* Pl. Expert Opp. 1).

On this point, Plaintiff points to on-the-record representations by defense counsel, Lorie Almon, to this Court on August 29, 2017. (*See* Pl. Expert Opp. 4). Ms. Almon stated that, when the ION Board values the SARs, it "relies on a specific document provided by an outside consulting firm who does this valuation," and that "whatever the outside consultant says is what is used for people in Mr. Lavalette's class of SAR's recipients." (Aug. 29, 2017 Tr. (Dkt. #55) at 34:6-17, 37:4-15). Plaintiff goes on to assert that Ms. Almon clarified that the "specific document" is the SRR Report that formed the basis of DiGabriele's Report II. (Pl. Expert Opp. 5 (citing Aug. 29, 2017 Tr. at 36:3-19)). Based on those representations, the Court ordered Defendants to produce the SRR 2017 report to Plaintiff for DiGabriele's evaluation. (*See* Pl.

46

Expert Opp. 6).  Plaintiff contrasts these prior representations with

Defendants' assertions in their current briefing as well as Chris Parker's sworn

declaration in the instant matter stating that ION would *not* rely on an SRR

Report to value SARs.  (*See id.* at 3-4 (quoting Parker Decl. ¶¶ 9, 11)).

Defendants reply that Ms. Almon's representations to the Court

concerned solely ION's *past* practices in valuing SARs, in which ION did rely

exclusively on the third-party SRR Reports.  (Def. Expert Reply 1).  However,

according to Defendants, ION's process for determining the valuation

remained within the sole discretion of the ION Board, and six months *after* the

August 29, 2017 court conference, the Board decided not to rely on the SRR

Reports for its 2017 assessment.  (*Id.*).  Defendants' view is substantiated by

the fact that Parker's declaration is dated September 27, 2018, more than a

year after counsel's representations in the August 29, 2017 court conference,

and states specifically that "[t]he 2017 SRR Report ... was not determined for

the purposes of providing a monetary payment to SARs shareholders."  (Parker

Decl. 3, ¶ 9).

The Court finds that Defendants' counsel and declarants have not

submitted inconsistent statements in this matter, and that the doctrines of

judicial admission and judicial estoppel do not prevent Defendants from

arguing that DiGabriele should not have relied on the 2017 SSR Report in

making his calculations.  Nonetheless, even if the SRR Report estimation used

in Report II were not the same as the valuation that ION would use, and even

if ION's Board were to retain full discretion to alter its methodology for valuing

the SARs from year to year, these facts do not render DiGabriele's Report II irrelevant. Because Report II relies on the same third-party assessments that the ION Board relied on for all valuations made prior to 2017, Report II may shed light on the likely expected range of valuations that ION could have produced for 2017 and subsequent years. Differences between DiGabriele's reliance on the SRR Report and alternative methodologies that the ION Board has or could apply go to weight, not admissibility, of the evidence. *See, e.g.*, *Zerega Ave. Realty Corp.*, 571 F.3d at 213-14. Defendants can vigorously cross-examine DiGabriele about these differences, but the differences are not a basis on which the Court will prevent the jury from hearing his testimony.

### b. The Relevance of the DiGabriele Reports

Regarding the issue of whether the SARs Agreement contemplates a cash payment for SARs, Plaintiff makes the argument that this issue is "immaterial to whether DiGabriele's Report II satisfies the *Daubert* standards." (Pl. Expert Opp. 2). However, the relevance of proposed testimony is a key issue under Rule 702. *See* Fed. R. Evid. 702 (stating that the Court must determine whether the proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."); *see also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 283 (inquiring into whether testimony is relevant). Thus, in an abundance of caution, the Court will address this issue as well.

According to the SARs Agreement, ION issued Plaintiff a number of SARs on February 10, 2015, of which at least 1,703 SARs vested on

January 1, 2016.  (*See* Stieber Decl., Ex. J at § 2(a)).  If Plaintiff's employment ended "for any reason other than a termination without cause or death," all of his SARs, including vested and unvested portions, were to expire immediately.  (*Id.* at § 3(a)).  If Plaintiff's employment ended in a termination without cause, Plaintiff would keep "any vested portion" of the SARs.  (*Id.* at § 3(b)).

Defendants argue, in the first instance, that Plaintiff resigned and thus that all of his SARs expired.  (*See* Def. Expert Br. 5).  In the alternative, Defendants argue that, even if ION *did* terminate Plaintiff without cause, the remedy should be a reinstatement of Plaintiff's vested SARs.  (*See* Def. Expert Reply 8-9).  The vested SARs are not, according to Defendants, exchangeable for cash and may be exercised only upon a Change in Control of ION or the tenth anniversary of the grant date, in this case February 10, 2025.  (*See* Def. Expert Br. 5-6).  Even then, in Defendants' view, ION's Board would have full discretion to determine the fair market value per SARs share.  (*See id.* at 6).  Finally, Defendants contend that the SARs Agreement grants Plaintiff no rights to dividends because it states that it does "not entitle [Plaintiff] to any rights as a shareholder."  (*Id.* (citing Stieber Decl., Ex. J at § 13)).

Plaintiff does not dispute that, under the terms of the SARs Agreement, he is not entitled to cash value for the SARs unless there is a Change of Control, or until the tenth anniversary of the grant date.  (*See* Pl. Expert Opp. 18-19).  Instead, Plaintiff contends that he should be afforded monetary damages on all his claims, including his breach of contract, NYCHRL, and NYFCA claims, rather than specific performance of the SARs Agreement in the

form of a reinstatement of his vested SARs, and that the monetary damages should be based at least in part on the cash value of his SARs. (*See id.*). Plaintiff reasons that the specific performance remedy would leave his SARs units vulnerable to dilution or a change in valuation controlled by Defendants, who, if Plaintiff prevails in this action, would have been adjudicated as wrongdoers. (*See id.*). Defendants reply that permitting DiGabriele to testify as to the cash value of the SARs would mean permitting Plaintiff's expert to ask "that he be placed in a position *superior* to what he would have held had he continued his employment with the Company. This constitutes a legal conclusion inappropriate for expert testimony and in contravention of the *Daubert* standard." (Def. Expert Reply 9).

The Court agrees with Plaintiff that, were he to prevail on his claims in this matter, his remedies would not necessarily be limited to specific performance of the SARs Agreement. For instance, the NYCHRL entitles prevailing plaintiffs to an array of remedies, including but not limited to the "award of back pay and front pay" as well as "compensatory damages[.]" N.Y.C. Admin. Code § 8-120(a)(2), (8). And the NYFCA entitles prevailing plaintiffs to, among other things, "reinstatement of full fringe benefits" and "compensation for any special damages sustained." N.Y. State Fin. Law § 19l(l)(c), (e). DiGabriele's testimony regarding the cash value of the SARs is, at a minimum, relevant to a determination of compensatory or special damages.

Accordingly, the Court grants Defendants' motion to exclude Report I and any portion of DiGabriele's testimony that relies on Report I, and denies Defendants' motion to exclude Report II and any portion of DiGabriele's testimony that relies on Report II.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment, and motion to strike, are DENIED. Defendants' *Daubert* motion and motion to exclude expert testimony is GRANTED in part and DENIED in part.

The Clerk of Court is directed to terminate the motions at docket entries 91, 102, and 133. The parties are ORDERED to submit a joint letter on or before **August 19, 2019**, in which they are to set forth their availability for trial in the second and third quarters of 2020, to request an alternative dispute resolution mechanism, or to propose an alternate path forward for resolution of this case.

SO ORDERED.

Dated:     July 29, 2019
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge